IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>$70,194 UNITED STATES CURRENCY,<br><br>Defendant. | Civil No. 8:21CV449<br><br>**COMPLAINT FOR FORFEITURE *IN REM*** |

The United States of America, for its cause of action against the defendant property, pursuant to Rule G(2) of the Supplemental Rules for Admiralty and Maritime Claims and Asset Forfeiture Actions, states and alleges as follows:

### Nature of the Action

1. This is an action to forfeit property to the United States for violations of 21 U.S.C. § 881.

### The Defendant *in rem*

2. Defendant property is $70,194 U.S. currency seized by law enforcement from Solomon Williams and Shawn Watson on November, 20, 2020.

3. The U.S. Customs and Border Protection (CBP) currently has custody of the defendant property.

### Jurisdiction and Venue

4. This Court has subject matter jurisdiction for an action commenced by the United States pursuant to 28 U.S.C. § 1345, and for an action for forfeiture pursuant to 28 U.S.C. § 1355(a). This Court also has jurisdiction over this particular action pursuant to 21 U.S.C. § 881.

5. This Court has *in rem* jurisdiction over the defendant property pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts or omissions giving rise to the forfeiture occurred in this district.

## Basis for the Forfeiture

7. Defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes 1) money, negotiable instruments, securities and other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act, 2) proceeds traceable to such an exchange, and/or 3) money, negotiable instruments and securities used and intended to be used to facilitate a violation of the Controlled Substances Act.

## Facts

8. On November 20, 2020, Lincoln Police Department Officer John Hudec (hereinafter "Off. Hudec") was on patrol serving as a Homeland Security Investigations Task Force Officer.

9. While on patrol on Interstate 80 (hereinafter "I-80") at approximately 7:55 a.m., Off. Hudec observed a black Toyota Highlander (hereinafter "Toyota") bearing California license plate 8PCV221 traveling westbound near mile marker 390.

10. As the Toyota passed Off. Hudec, he observed no parties within the Toyota. In particular, Off. Hudec observed the driver was leaned back so far in his seat that Off. Hudec was unable to see any occupant of the vehicle.

11. Off. Hudec began to travel westbound on I-80 to try to catch up to the Toyota.

12. As Off. Hudec drew closer to the Toyota, he observed the Toyota attempt to pass a flatbed semi tow-type vehicle in the outside lane of traffic.

13. As the Toyota overtook the semi-style vehicle, Off. Hudec observed two separate traffic violations.

14. First, Off. Hudec observed the Toyota fail to signal properly before changing lanes.

15. In particular, Off. Hudec observed the Toyota activate the traffic signal to change lanes 50 to 70 feet prior to changing lanes.

16. This conduct was in violation of Nebraska statute 60-6, 161(2).

17. Second, Off. Hudec observed the Toyota did not give the semi-style vehicle adequate time and distance to make an evasive action behind it.

18. In particular, Off. Hudec observed the Toyota pass in front of the semi-style vehicle and only leave .69 seconds of timed distance traveled between the Toyota and semi-style vehicle.

19. This conduct was in violation of Nebraska statute 60-6, 133.

20. Due to these traffic violations, Off. Hudec initiated a traffic stop near mile marker 388.

21. As Off. Hudec approached the Toyota, he observed an unusually large amount of luggage.

22. This included two oversized suitcases as well as duffel and shoulder bags in the back of the Toyota.

23. Off. Hudec observed two occupants inside the Toyota.

24. Off. Hudec made contact with the driver, Solomon Williams (hereinafter "Williams").

25. Off. Hudec also made contact with the passenger, Shawn Watson (hereinafter "Watson").

26. Off. Hudec advised Williams and Watson that he initiated the traffic stop because the driver failed to signal properly before changing lanes and also because he pulled in front of the semi-truck at an unsafe distance.

27. Off. Hudec requested Williams's driver's license and vehicle information.

28. Williams provided Off. Hudec with his Missouri license.

29. Williams informed Off. Hudec that the Toyota was a rental vehicle and that he did not have the information for the Toyota.

30. Watson retrieved the Toyota registration from the glovebox.

31. The Toyota was a rental vehicle from Enterprise.

32. Williams said Enterprise did not have a paper copy of the rental agreement.

33. Williams was able to provide a digital copy of the rental agreement to Off. Hudec from Williams's cellular phone.

34. Off. Hudec observed that the rental agreement was for approximately five or six days in length.

35. Off. Hudec advised Williams and Watson that he was going to write a warning for the violations that he observed.

36. Off. Hudec requested Williams to sit in the front seat of Off. Hudec's vehicle during the traffic stop so that Off. Hudec could issue a warning.

37. Williams allowed Off. Hudec to conduct an exterior search of his person for any weapons prior to entering Off. Hudec's vehicle.

38. Off. Hudec did not locate any weapons on Williams's person.

39. Once inside Off. Hudec's vehicle, Off. Hudec observed that Williams had a substantial speech impediment.

40. Off. Hudec observed that Williams's speech impediment became worse when Off. Hudec asked him questions that made Williams nervous.

41. Based on Off. Hudec's training and experience, he knows that some types of speech impediments are more pronounced when an individual is stressed.

42. Williams informed Off. Hudec he was traveling to California but stopping in Las Vegas first.

43. Off. Hudec asked what part of California and Williams advised they were going to northern California.

44. Based on Off. Hudec's training and experience, he knows northern California is an area of the country where large amounts of narcotics—including marijuana—are produced and distributed through the black market throughout the United States.

45. Williams informed Off. Hudec that he was traveling to northern California to visit friends from back home that had moved to the area.

46. Based on his training and experience, Off. Hudec believed Williams's travel itinerary was illogical.

47. In particular, Off. Hudec observed the Toyota rental agreement was for approximately five days, which would only permit Williams to spend less than one day visiting his friends in northern California based on that travel itinerary.

48. While Off. Hudec continued to issue the warning, Williams acknowledged that it was fine Off. Hudec initiated the traffic stop against him and that he "needs to do better" regarding his driving.

49. Williams discussed traveling to Las Vegas on this trip and stated he wanted to get the full experience in Las Vegas but did not want to spend a lot of money.

50. Based on his training and experience, Off. Hudec again believed that Williams's travel itinerary was illogical because a trip to Las Vegas and northern California based on the five-day rental agreement was not enough time to do this type of traveling.

51. Off. Hudec asked Williams what he did for a living.

52. Williams advised that he was "testing school."

53. Williams explained that he was looking into going back to school.

54. Based on his identifying information, Off. Hudec observed Williams to be approximately five years outside of high school.

55. Off. Hudec asked Williams how he pays for school.

56. Williams advised that his girlfriend pays for a lot.

57. Williams further advised that family members pay for a lot of his school and that he does not have to come up with that money.

58. Based on his training, experience, and observations, Off. Hudec thought that it was unusual for Williams to be driving a rental vehicle costing several hundred dollars to go on a trip when he was not working and he did not take out student loans.

59. During this conversation, Off. Hudec observed that Williams's nervousness was extremely high.

60. Off. Hudec further observed that Williams's breathing was very fast and that his chest pulsated with his heartbeat.

61. Off. Hudec observed Williams's carotid artery visibly pulsating.

62. Furthermore, Off. Hudec observed that Williams's nervousness was impeding his speech as his impediment became more and more pronounced.

63. At this point, Sergeant Jason Mayo (hereinafter "Sgt. Mayo") arrived on scene.

64. Off. Hudec requested Sgt. Mayo to check the VIN number of the Toyota.

65. Off. Hudec then asked Williams how much the Toyota rental actually cost him.

66. Williams responded approximately $500.

67. As Sgt. Mayo returned from checking the VIN number, he advised Off. Hudec he had made contact with Watson and that Watson did not say anything about going to Las Vegas.

68. Sgt. Mayo also advised that Watson had a prior felony arrest for a narcotic-related incident prior to this stop.

69. After learning this information about Watson, Off. Hudec asked Williams if Williams was a big gambler.

70. Williams advised that he was not but that Watson was really wanting to go to Las Vegas and that is why the two of them were going.

71. Off. Hudec noted that Williams and Watson's stories regarding the trip itinerary were inconsistent.

72. Off. Hudec finished explaining the traffic violations and provided the warning to Williams.

73. Off. Hudec told Williams to be safe and to have a good rest of his trip and shook hands with Williams.

74. As Williams opened the door to exit Off. Hudec's vehicle, Off. Hudec asked Williams if he would be willing to answer a couple more questions before he left.

75. Williams consented to this consensual encounter.

76. Williams shut the door and continued sitting in the front passenger seat of Off. Hudec's vehicle.

77. Off. Hudec asked Williams again who paid for his college.

78. Williams responded that his girlfriend and family paid for much of it.

79. Off. Hudec asked Williams if there was anything illegal in the Toyota—including firearms or illegal controlled substances.

80. Williams advised he did not have any firearms.

81. Williams also advised that there were no illegal controlled substances in the Toyota.

82. Off. Hudec asked Williams if there were large amounts of United States currency in the Toyota.

83. Williams advised that he has approximately $1,000 of spending money.

84. Williams further advised that Watson had a few hundred dollars on him.

85. Williams denied consent to search the Toyota but stated Off. Hudec could look in the windows.

86. Off. Hudec exited his vehicle, approached the Toyota, and made contact with Watson.

87. Watson advised that they only have a couple thousand dollars in the Toyota.

88. Off. Hudec asked Watson what belonged to him inside the Toyota.

89. Watson advised the two backpacks and a grey suitcase belonged to him.

90. Watson denied consent to search any of his items within the Toyota.

91. Off. Hudec returned to his vehicle and asked Williams if he would consent to a police K-9 conducting an exterior sniff of the Toyota.

92. Williams denied consent for the K-9 sniff.

93. Off. Hudec advised Williams that Williams was detained as Off. Hudec believed he had reasonable, articulable suspicion that criminal activity was afoot.

94. Off. Hudec placed Williams in the backseat of his vehicle.

95. Off. Hudec then walked up to the Toyota, had Watson step out of the Toyota, and placed in the backseat of Hudec's vehicle as well.

96. At this time, Sgt. Mayo completed a K-9 sniff of the exterior of the Toyota.

97. Sgt. Mayo's K-9 alerted and indicated to the odor of narcotics emitting from inside the vehicle.

98. After the K-9 alerted and indicated to the odor of narcotics, Off. Hudec conducted a probable cause search of the Toyota.

99. Off. Hudec searched in the rear cargo of the Toyota.

100. Off. Hudec located and opened the grey suitcase.

101. Inside the grey suitcase Off. Hudec observed a mattress pad and two blue bookbags which contained two assault rifle pistols.

102. One of the firearms was a Zastava Arms USA Model #ZPAP92 serial number Z92-078127.

103. This is a 7.62x39 mm pistol style rifle.

104. This firearm had a magazine in it with a full clip.

105. The second firearm seized was a CAI Georgia VT Micro Draco, serial number PMD-16129-19 RO.

106. This firearm is a 7.62x39 mm pistol style rifle.

107. This firearm also had a clip in it.

108. During the search, Off. Hudec noticed the odor of raw marijuana emitting from inside this suitcase as well.

109. Officers also located two bundles of United States currency located inside the suitcase liner.

110. Law enforcement located another suitcase in the third-row seating area of the Toyota.

111. Inside the liner of this suitcase, officers found a long row of vacuum sealed bag with a large amount of United States currency.

112. Officers located bundled currency in the center console of the Toyota.

113. Officers also located currency in the Toyota glovebox.

114. The total United States currency seized from inside the Toyota was $70,194.

115. The currency pretested positive for THC.

116. During the search of the Toyota, Williams and Watson were both located in the backseat of Off. Hudec's vehicle.

117. Williams made statements to Watson indicating he had knowledge of the United States currency in the Toyota.

118. Watson made statements to Williams indicating he had knowledge of the United States currency in the Toyota.

119. During the search, Off. Hudec returned to his vehicle and informed Watson and Williams that they were not under arrest.

120. Off. Hudec read the *Miranda* warning to Williams and Watson.

121. Williams and Watson indicated they understood the *Miranda* warning.

122. Both Williams and Watson gave consent to law enforcement to have extractions completed of their cell phones.

123. Williams's cell phone was a white iPhone.

124. Williams voluntarily provided the passcode to his cell phone to officers.

125. Williams's phone contained numerous chat messages whereby Williams discussed trafficking marijuana with multiple individuals.

126. Williams's phone contained hundreds of chat messages where Williams is selling marijuana to numerous different contacts.

127. One of Williams's chat messages included a text string on or about November 15, 2020, whereby he discussed obtaining marijuana during an upcoming trip.

128. Additionally, Williams's phone records contained chat messages with phone number (XXX) XXX-5435.

129. This phone number is associated with Deonte Woodson (hereinafter "Woodson").

130. Williams's messages with Woodson discussed in detail a trip to go to California to buy suitcases full of marijuana.

131. Williams's messages regarding marijuana trafficking with Woodson occurred through November 19, 2020.

132. Williams's phone contained images of *inter alia* marijuana buds, pounds of marijuana, handguns for sale, large stacks of currency, and individuals smoking marijuana.

133. Williams's phone contained numerous videos of pound quantities of marijuana.

134. Williams's phone also contained a video of stacks of United States currency on a bed with a handgun.

135. Watson's cell phone was a black iPhone.

136. Watson voluntarily provided the passcode to his cell phone to officers.

137. Watson's phone contained several photographs of firearms—including *inter alia* rifles, shotguns, pistols, and extended magazines.

138. Watson's phone contained hundreds of images of marijuana.

139. These images include *inter alia* large quantities of marijuana in piles, plastic bags, and in glass containers.

140. These images also include marijuana being consumed in pipes and rolled into joints/blunts.

141. Images of THC shatter and other THC edibles are also present on Watson's phone.

142. Watson's phone contained hundreds of videos of marijuana.

143. Such videos include *inter alia* dispensary containers, close-up marijuana buds, and marijuana being smoked by individuals.

144. Watson's phone contained numerous messages involving communications about marijuana.

145. Off. Hudec transported the currency to WestGate Bank where it was counted by banking staff.

146. During the count, Off. Hudec noticed the odor of raw marijuana emitting from the currency itself while being counted.

147. WestGate Bank created a cashier's check in the amount of $70,194 to United States Customs and Border Protection.

**Claim for Relief**

WHEREFORE the United States of America prays the defendant property be proceeded against for forfeiture in accordance with the laws, regulations and rules of this Court; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that the defendant property be condemned, as forfeited, to the United States of America and disposed of according to law and regulations; that the costs of this action be assessed against the defendant property; and for such other and further relief as this Court may deem just and equitable.

                              UNITED STATES OF AMERICA,
                              Plaintiff

                              JAN W. SHARP
                              Acting United States Attorney

By:    s/ *Mikala Purdy-Steenholdt*
        MIKALA PURDY-STEENHOLDT (NY#5112289)
        Assistant U.S. Attorney
        1620 Dodge Street, Suite 1400
        Omaha, NE 68102-1506
        Tel:  (402) 661-3700
        Fax:  (402) 345-5724
        Email: Mikala.Purdy-Steenholdt@usdoj.gov

# VERIFICATION

I, Andrew Vincik hereby verify and declare under penalty of perjury that I am a Special Agent Homeland Security Investigations (HSI) that I have read the foregoing Verified Complaint *in Rem* and know the contents thereof, and that the factual matters contained in paragraphs 8 through 147 of the Verified Complaint are true to my own knowledge, except that those matters herein stated to be alleged on information and belief and as to those matters I believe them to be true.

The sources of my knowledge and information and the grounds of my belief are the official files and records of the United States, information supplied to me by other law enforcement officers, as well as my investigation of this case, together with others, as a Special Agent with Homeland Security Investigations (HSI).

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: November 24th, 2021

Andrew Vincik
Special Agent
Homeland Security Investigations (HSI)